IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CHRIS STOWELL                                                                    PLAINTIFF

        v.                              Civil No. 12-5125

DEPUTY LONG, Benton
County Detention Center                                                          DEFENDANT


**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

        This is a civil rights action filed by the Plaintiff, Chris Stowell, pursuant to 42 U.S.C. §

1983.  He proceeds *pro se* and *in forma pauperis.*

        Plaintiff is currently an inmate of the East Arkansas Regional Unit of the Arkansas

Department of Correction (ADC).  At all times relevant to this complaint, Plaintiff was being

detained in the Benton County Detention Center (BCDC).

        The sole claim in this case is whether the Defendant, Deputy Long, used excessive force

against the Plaintiff on April 24, 2012.  Only an individual capacity claim remains.  Defendant has

filed a motion for summary judgment (Docs. 42-44).  A video conference hearing was held on June

10, 2014, to allow the Plaintiff to respond to the summary judgment motion by testifying.

        In support of his motion for summary judgment, Defendant submitted a DVD of

surveillance camera footage of the incident at issue (Doc. 44 Ex. 1).  During the hearing, Plaintiff

inquired as to whether there was footage from a second surveillance camera.  At the Court's

direction, defense counsel inquired into the matter following the hearing and subsequently provided

the Court and the Plaintiff with the footage from the other camera (Doc. 50 Ex. 1).

-1-

Defendant also supported his summary judgment motion with incident reports from himself and other deputies who were involved in or witnessed the incident (Doc. 44-1 pgs. 8-12). During the hearing, Plaintiff inquired as to whether Deputy Abby Coggin, who witnessed the incident, prepared an incident report. At the Court's direction, defense counsel inquired into this following the hearing and submitted an affidavit from Captain Jeremy Guyll, the BCDC jail administrator, stating that he confirmed with Deputy Coggin that she did in fact write a report, but Captain Guyll checked and confirmed that no such report could be located in BCDC's "system, . . . hard copy files [or] other materials." (Doc. 50). Captain Guyll asked Deputy Coggin to prepare a report based on her best recollection of the incident and that report was provided to the Court (attached to this report and recommendation as Court's Ex. 1).

The Court determined that a supplemental hearing should be held to determine , if possible, why Deputy Coggin's original report could not be located. The Court directed Defendant to produce Captain Guyll, Deputy Coggin, and someone knowledgeable in how reports are stored and retrieved in either computerized or non-computerized form.

On August 11, 2014, a supplemental hearing was held. The Court heard the testimony of Deputy Coggin, Captain Guyll, Gary Fischback (via video conference), and Bobby Cates. Plaintiff participated through video conference. The summary judgment motion is now ripe for decision.

**1.  Background**

Plaintiff was incarcerated at the BCDC off and on from December 20, 2011, to September of 2012. On April 24, 2012, the date of the incident at issue in this case, Plaintiff was a pretrial detainee.

Plaintiff testified that after breakfast on April 24th, BCDC personnel directed the detainees to return to their cells. A shake down for contraband was then conducted of the cells. According

-2-

to Plaintiff, Defendant only occasionally was involved in shake downs. However, on this day, Defendant was shaking down the cell next to Plaintiff's.

Deputy Xiong was shaking down the Plaintiff's cell.  Plaintiff testified that he was instructed to remove some toothpaste from the light fixture.  Plaintiff denied having put the toothpaste on the light.  Plaintiff testified that at that point, Defendant came into the cell with a "tough man attitude."  Plaintiff indicated he went and got the cleaning chemicals and cleaned the light fixture.

Plaintiff testified that his shower items had been placed outside his cell.  Plaintiff stated that he was complaining and asking to get his shower items from the day room.  He asked Defendant and another deputy, who were at the time outside his cell, if he could get his shower items.  Plaintiff testified that if you left your things outside of your cell, jail personnel would take the items and you could not get replacement items.  Defendant responded to Plaintiff's request, asking how he could know whether or not the items were Plaintiff's.  Plaintiff replied that he would not say the items belonged to him if they did not.

Plaintiff testified that he was "stressing about his stuff" and pointed to the items.  Plaintiff asserts that Defendant then grabbed his arm and took him to the day room.  Plaintiff testified that his hands were not handcuffed but they were behind his back.  He indicated that BCDC personnel had detainees place their hands behind their back when putting handcuffs on.  Plaintiff testified that Defendant was bumping him against the wall and whispering in his ear.  Plaintiff could not recall what Defendant was saying.  Plaintiff testified that he was yelling and calling for the other detainees to watch what was going on and that he was not resisting.

Plaintiff did not suffer any physical injury as a result of what took place inside the pod.  He testified that he was just being jerked around like he was a puppy.

-3-

Plaintiff was put in handcuffs and Defendant walked Plaintiff towards the pod door and called for the pod door to be opened. Plaintiff testified he kicked the door, which opens outward, open because he knew Defendant was going to use his face or upper body to open the door. Plaintiff knew this was Defendant's intention because Plaintiff was too close to the door for Defendant to open it.

The two were going towards pod control. Plaintiff testified that Defendant slammed him into the wall of pod control and then flipped him onto the floor. Plaintiff was handcuffed at the time. Plaintiff testified that there were two cameras in pod control filming from different angles.

Plaintiff testified that the only command Defendant gave him was to stop resisting when he was being placed in cuffs. Plaintiff testified, however, that he was not resisting in anyway. Plaintiff testified that when he was on the floor face down, he began talking about the Defendant's wife and children in a way that Plaintiff acknowledged was not good. Plaintiff estimated that Defendant and four or five officers were on top of him. Plaintiff testified that Defendant was on top of him with his knees on Plaintiff's back and holding the handcuffs. Plaintiff indicated he made the comment that if Defendant thought he was resisting, Defendant should take off the cuffs. Plaintiff testified that he was not resisting or trying to stand up, and he was not disobeying any orders.

Plaintiff testified that Defendant came over and kneed him four or five times and then uncuffed him right in the middle of the altercation. At this point, Plaintiff said he told the officers to back away and leave him alone. Plaintiff testified that he got to his feet and tried to rush the Defendant, but the other deputies snatched him from behind and put him on the floor again. Plaintiff did not make contact with the Defendant. Plaintiff testified he was being kicked, punched in the head, and slammed to the ground. Plaintiff had his hand on his head in order to protect it.

-4-

According to Plaintiff, Defendant was on top of him and placed him in cuffs again.  At this point, Plaintiff was taken to isolation.  Plaintiff testified that two sergeants came to see him,  warned him to stay away from the deputies, and told him that he was lucky he was not in the hospital. Plaintiff was seen by the jail medical staff.

Although Plaintiff was not given a disciplinary violation, he was in lock down for nine days.[1]  At some point, Defendant came back and "started messing with" the Plaintiff.  Plaintiff stated that Defendant would come back and just shake down Plaintiff's cell.

Plaintiff testified he had bruises and knots all over his head, nose, and hip, and his ear turned blue.  He indicated he had skid marks down both sides of his body.  He was given Tylenol for his headache.  Plaintiff testified that his hip still bothers him and that it felt numb or like a growing pain.  He also indicated that his whole leg felt like it was tingling almost like it feels when it has been asleep.  His groin area also felt that way.

In support of his motion for summary judgment, Defendant provided the Court with a copy of his incident report, a supplement prepared by Deputy Tou Xiong, a supplement prepared by Deputy Stephen Rosser, a supplement prepared by Deputy Chance Fink, and a supplement prepared by Deputy Thomas Hall.  *Deft's Ex.* 1 at pgs. 8-12.  While there are some minor differences in these reports and the incident report prepared by Long, these reports support Defendant's version of what occurred.  *Id.*

According to these reports, Plaintiff 's cell was being searched when he was asked by Deputy Xiong to remove toothpaste from a light fixture.  *Deft's Ex.* 1 at pg. 10.  Plaintiff initially refused to obey Deputy Xiong's order and was taken to pod control.  *Id.*  He then complied with

---

[1]No explanation was provided as to why the Plaintiff was locked down without being issued a disciplinary violation and afforded the due process guarantees triggered by such disciplinary measure.

the order but when he was done he threw the spray bottle of cleaner into the dayroom.  *Id.*  While the cell search was being completed, Plaintiff was told to quit talking to the other inmates and to stand still.  *Id.*  He was slow to comply.  *Id.*  Once he was back in his cell, Plaintiff began asking to retrieve his shampoo and soap from the day room.  *Id.* at pgs. 8-12.

Plaintiff became agitated and began throwing his arms in the air when he was told his cell would have to be searched for a second time to verify that the shampoo and soap recovered from the floor of the day room was his.  *Def's Ex.* 1 at pg. 9.  Plaintiff refused to obey an order to put his hands behind his back,  arguing that he was nott throwing his arms around aggressively.  *Id.* He was handcuffed and escorted to pod control.  *Id.*  Defendant maintains that during the escort, Plaintiff displayed active resistance and pushed off the pod door back into the Defendant.  *Id.* at pg. 9.  Defendant briefly placed Plaintiff against the wall and then took him to the floor, at which time Deputies Rosser and Hall maintained control of him.  *Id.*

Plaintiff began making remarks about Defendant's wife and stating that Defendant should take the cuffs off and then they would see how bad he was.  *Def's Ex.* 1.  According to Defendant, he asked Plaintiff why he wanted the handcuffs off and Plaintiff replied: "Take these f------ things off and have the f------ deputies stay out of it."  *Id.* at pg. 9.  Defendant reported that in an effort to get Plaintiff to "relax," he removed the handcuffs.  *Id.*  At that point, Defendant states that Plaintiff stood up and  attempted to punch him in the face.  *Id.*

In Deputy Fink's report, he indicates he was told that Defendant had been struck in the face by the Plaintiff.  *Def's Ex.* 1 at pg. 11.  Deputy Fink also indicates that the Plaintiff admitted to striking Defendant in the face twice.  *Id.*

Plaintiff was taken to the ground and ordered by multiple deputies to quit resisting and put his arms behind his back.  *Def's Ex.* 1 at pg. 9.  Once the deputies regained control of the Plaintiff

he was taken to E-pod pending a disciplinary hearing.  *Id.*  As detailed above, while Plaintiff was locked down for nine days, there is no evidence that Plaintiff was issued a disciplinary or that any type of disciplinary hearing was conducted.

### *Photographs*

Defendant submitted with his summary judgment motion colored photos of Plaintiff's injuries.  Doc. 44-1.[2]  The first photo shows a raised area or knot on the left side of Plaintiff's forehead.  The knot is fairly large covering about half of the left side of his forehead and extends into his hairline.

The second photo shows abrasions on the right side of his face.  The worse abrasions are in the cheekbone area.  There is one small area, approximately the size of a pea, where the surface of the skin has been scraped away.  There are also four or five small areas near his jaw bone and neck where it appears the skin has been scraped away.

The third photo is of the right side of Plaintiff's head.  There is a red raised circular area near the crown of Plaintiff's head.  Because of his hair, it is not possible to tell whether or not the skin was broken.

The fourth photo shows the right side of the Plaintiff's neck and his right ear.  There is an area of reddened skin extending from the back of his right ear to the hairline at the nape of his neck.  Near the ear, the skin is red but it does not appear that the surface of the skin has been scraped away.  Abrasions exist on the area closer to the hairline on the back of his neck.

The fifth photo is of what appears to be Plaintiff's right hip.  There is a small circular abrasion.

---

[2]The Court has numbered the photographs on the lower right hand corner.  The parties have been provided with copies of the photos as numbered by the Court.

The sixth photo shows the left side of the Plaintiff's neck and his left ear. There is a triangular area of reddened skin extending from the back of his left ear to the hairline just below the lobe of his ear. There is also a small abrasion at the upper most part of the jaw bone.

The seventh photo appears to be of the Plaintiff's left side and back. In the rib cage area, there is a reddened area with a scratch running through it.

The eighth photo appears to be of Plaintiff's right upper arm just below the shoulder. There is an abrasion with what appears to be bruising.

The ninth photo shows a small reddened area with a scratch through it on the lower part of Plaintiff's left breast. There also appears to be a reddened area on the upper breast near the chest bone and below the c in the tattooed word grace.

The tenth photo is of the left side of Plaintiff's face below his eye. There is a small abraded area in the smile line (nasolabial line) from the bottom of Plaintiff's nose to the corner of his mouth.

### *Video*

The DVD, Doc. 44 Exhibit 1, contains three separate video clips. The first video clip was taken from a surveillance camera inside the pod. It shows the day-room area of the pod and the cell doors. Defendant and another deputy are seen entering separate cells. Plaintiff leaves his cell and he is escorted across the day-room and disappears from the camera's view. Plaintiff is not restrained in anyway but he walks with his hands behind his back.

For a time, the clip is of the empty day-room. Plaintiff and the deputy then re-enter the pod, and Plaintiff has some type of red cloth in his right hand. Plaintiff takes a spray bottle off a table in the day-room and enters his cell.

Plaintiff re-enters the day-room and puts down the spray bottle and red cloth. Plaintiff then goes to the wall, faces it, and puts his hands up. Plaintiff is patted down. At this time, Plaintiff is not in handcuffs or otherwise physically restrained.

Plaintiff, with his hands behind his back, moves around the day-room. Plaintiff returns to his cell and a deputy continues to stand near the door. Defendant leaves the cell he was searching and appears to be trying to shut Plaintiff's cell door. Defendant takes a hold of Plaintiff's upper arm or shoulder and Plaintiff comes out of the cell, is placed against the wall, and handcuffed. Plaintiff is escorted out of the pod. Plaintiff testified that he does not contend excessive force was used against him inside the pod.

The second video clip shows the inside of the day-room from a different angle. In this one the cell doors cannot be seen. Instead, all that can be seen are five tables, two staircases, and the pod door. Defendant escorts Plaintiff to the pod door. Plaintiff is not resisting.

The third clip shows the pod control, which consists of a raised area surrounded by a half wall in the center of an area into which the pod doors open. Plaintiff and Defendant appear on the left side of the screen and Plaintiff is walked to the wall of pod control and pushed into it. His torso area and then the right side of his face are put against the wall. Plaintiff turns his head and then the left side of his face comes into contact with the wall. Defendant uses force to place Plaintiff against the wall and presses into the Plaintiff with both arms.

Plaintiff does not appear to be resisting. Defendant then turns the Plaintiff to the left and takes him to the floor. A struggle ensues but is off to the bottom left of the screen. It appears that at least four deputies were present.

Plaintiff is stood up but is quickly taken to the floor again. It was at this time that Plaintiff lunged at Defendant. During this struggle, Defendant and four other officers are on the floor with

the Plaintiff and were basically on top of the Plaintiff.  No portion of the Plaintiff is visible for a period of time.  Plaintiff's upper body can then be seen, and he has one arm under his face and one hand on the back of his head.

The struggle continues and six officers surround the Plaintiff.  Four are on the floor and two are standing.  One officer is holding Plaintiff's leg.  Plaintiff is stood up, very briefly put against the wall of pod control, and then escorted out.

As explained above, following the first hearing on Defendant's motion for summary judgment, video footage from a second camera in the pod control area was provided to the Court.  Doc. 50-1.  Again, Plaintiff is shown being pushed into the wall and held there by Defendant.  It is not clear what prompted Defendant's action, but he pulls Plaintiff back and appears to be taking Plaintiff to the floor.  At this point, neither Plaintiff nor the Defendant are within the camera's view.  Other officers can be seen going to assist the Defendant.

After a short period of time, four officers come into view struggling with the Plaintiff.  At this point, the Plaintiff is on the floor and no part of his body can be seen; four officers can be seen either kneeling next to or partially on top of the Plaintiff.  Two officers retreat and Plaintiff is lifted to his feet by use of his arms that are handcuffed behind his back.  Plaintiff is very briefly held against the pod control wall and then escorted away.

### Deputy Coggin's Report

According to Deputy Coggin's report, prepared and submitted after the first hearing, Plaintiff was in handcuffs and he and the Defendant were arguing when she came on shift.  *Court's Ex.* 1.  The two were yelling and cursing at each other and Deputy Coggin stated that it was obvious the Defendant was upset.  *Id.*

-10-

Deputy Coggin reports that Defendant said he would "fight [Plaintiff] like a man, without the handcuffs." *Court's Ex.* 1. Plaintiff was stood up and the handcuffs removed. *Id.* Deputy Coggin states that as soon as the handcuffs were off, Plaintiff turned to face the Defendant yelling at him and getting in his face. *Id.* Defendant said something about the Plaintiff getting into his face and Plaintiff "threw his hands in the air and said 'This is me getting in your . . . face.'" *Id.* Defendant then took Plaintiff to the floor. *Id.* Several deputies got "involved in the altercation." *Id.* They stood Plaintiff back up and put him in handcuffs. *Id.* Deputy Coggin recalled Defendant saying something like "I got marks on me now, you hit me!  I'm charging you're a-- with another Felony." *Id.*

### Supplemental Hearing

At the supplemental hearing, Deputy Coggin testified that she was a detention deputy when the incident occurred on April 24, 2012, but she is now a patrol deputy. She recalled the incident very well.

The Defendant and Plaintiff were arguing back and forth. She heard Defendant say that he would get the Plaintiff up and then Defendant said he would fight Plaintiff like a man. Once Plaintiff was on his feet and the handcuffs were taken off, Plaintiff "got up in" the Defendant's face. Specifically, Plaintiff raised his hands to about shoulder height and leaned into Defendant's face. Deputy Coggin testified that Plaintiff put his chest forward and his shoulders back like he wanted to fight.

Deputy Coggin heard Plaintiff say "this is me getting up into your face." Deputy Coggin did not see Plaintiff hit, strike, or even attempt to hit the Defendant. Deputy Coggin did not see anyone striking or hitting Plaintiff. She indicated she had a good view over the concrete wall.

-11-

Deputy Coggin testified that all the officers put Plaintiff back down on the floor.  She indicated there was a scuffle and it was not a smooth placement.  Plaintiff was then handcuffed. Deputy Coggin testified that she did not see anything wrong with this situation.

Deputy Coggin testified that she had gone to command staff, including then Lieutenant Guyll, about what had occurred.  In her view, Defendant's conduct was not appropriate.  In particular, she testified that Defendant saying he would fight Plaintiff like a man was inappropriate behavior.  Deputy Coggin was told it would be looked into, but she never learned what the command staff decided.

Deputy Coggin testified that within an hour or two of the incident, she had typed an incident report on the control pod computer located closest to D-130.   She used the Jail Management Software's (JMS) internal incident report form.  She indicated the form was completed by tabbing through various fields filling in the inmate name, housing unit, and other background information. Once this was done, Deputy Coggin  wrote a narrative regarding the incident.  She testified that once you hit save,  the report should stay in the system.  Deputy Coggin believed she had saved the report in the JMS system.  Deputy Coggin had no explanation for why the report could not be found on the system.  She indicated she did reports all the time and had never had an issue with entering a report into the system. Deputy Coggin recalled printing out a copy of the report and sharing it with the other deputies.  She took the report home and shared it with her husband.  Deputy Coggin was surprised that none of the other incident reports said anything about Defendant's statement that he would fight Plaintiff like a man. Deputy Coggin testified that she spoke with the Plaintiff in lock down and told him she had already talked to her command staff and written a report about the incident.

-12-

Captain Guyll, the current jail administrator, testified that he was a Lieutenant at the time of the incident. He vaguely recalled talking to Deputy Coggin about the incident. However, he could not recall having seen a written report from Deputy Coggin until he saw the supplemental report.

Captain Guyll testified the jail had two software systems at the time--JMS and Gemini. He did a name search in JMS using both Deputy Coggin's name and the Plaintiff's name but could not locate the report. In Gemini, Captain Guyll looked into Deputy Coggin's file but found no reports on the April 24th incident there. Captain Guyll stated that he has been told that it was difficult to delete a report.

Captain Guyll testified that internal investigations are done by the jail commander. Disciplinary issues are handled by the sergeants or the jail commander. The jail commander at the time was Chris Sparks and he would have done the investigation or handed it over to the criminal investigation division (CID). However, Captain Guyll testified that there was no record of any investigation of the incident. Captain Guyll testified that if an investigation was done, there would be records and there were none regarding the April 24th incident. Captain Guyll testified that if he received a report like Deputy Coggin's supplemental report, he would suspend or terminate the officer involved.

Gary Fischback testified that he works for Southern Software, which provides software designed for public safety agencies and municipalities. Southern Software developed the software used at the BCDC. Fischback indicated he had worked in law enforcement for just over twenty-five years.

He described the JMS program as a client server based software. He likened the system to a wheel with a hub and spokes. The hub is the center of the wheel where all information is sent.

-13-

The individual computer systems are the spokes that transfer the information from the computer to the hub.

Fischback testified that when someone types in a report on JMS that data is sent back to the main computer database or the hub.  The data is stored in the hub in two ways.  First, the data is stored on tables with rows and columns.  Second, an audit trail is created that indicates when the data was entered, modified, and/or deleted.   The data is in chronological order.  No data is saved on the actual computer on which the report is typed.

Fischback testified that he was asked to look for a report made by Deputy Coggin about the April 24th incident.  He searched 7.6 million records to see if Deputy Coggin had created a record. He found none.  He also testified that most deputies do not have the capability to delete records. He found no record of a report being created or deleted.

Fischback testified that, in any event, records from the audit trail cannot be deleted. Fischback testified that if Deputy Coggin prepared a report and failed to save it, there would be no record of that because there is no automatic save feature on the JMS program.  Fischback did find other incident reports about the April 24th incident, but none were written by Deputy Coggin.

Bobby Cates testified that he works in the Benton County Information Technology Department under the authority of the County Judge.  Cates indicated the Gemini system was a central file server that served as a remote location for saving file information.  Reports could be saved into  the Gemini server or on to the hard drive of the computer itself.   Reports entered into the JMS were not on Gemini or the local computer.

Cates indicated he was asked to do research on the Gemini system to find a report written by Deputy Coggin about the April 24th incident.  He searched the Gemini server but did not find a report by Deputy Coggin but did find reports submitted by other officers.  He also searched the

-14-

D-pod computers themselves. He did not find a report by Deputy Coggin. One computer in D-pod had been replaced but Cates did not know if it was the one Deputy Coggin had used.

Cates testified that when a computer is replaced, the computer is kept for six months. After that, the hard drive is removed and destroyed and the rest of the computer is sent to recycling.

### 2. Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." National Bank of Commerce v. Dow Chemical Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." Id. (citing, Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985)).

### 3. Discussion

Defendant first maintains that he is entitled to summary judgment in his favor because he used only the minimal amount of force necessary to achieve a legitimate objective. In this

-15-

regard, Defendant maintains the video evidence shows that he escorted Plaintiff from his pod in a very controlled and gentle manner.   Alternatively, Defendant contends he is entitled to qualified immunity.  He points out that when he took the handcuffs off, the Plaintiff took a swing at him. He maintains no case has ever imposed constitutional liability under such facts.

### A.  Use of Force

"Because [Plaintiff] was a pretrial detainee at the time of the alleged violation of his constitutional rights, we analyze [his] claim against [Deputy Long] under the Fourteenth Amendment, rather than the Eighth Amendment." Morris v. Zefferi, 601 F.3d 805, 809 (8th Cir. 2010)(citations omitted).

> "The Due Process Clause of the Fourteenth Amendment protects pretrial detainees from the use of excessive force that amounts to punishment. Because the Due Process Clause prohibits *any* punishment of a pretrial, be that punishment cruel-and-unusual or not, we ask whether the defendant's purpose in using force was to injure, punish or discipline the detainee."

Jackson v. Buckman, 756 F.3d 1060, 1067 (8th Cir. 2014)(internal quotation marks and citations omitted).

The Due Process inquiry uses the objective reasonableness inquiry of the Fourth Amendment. *Id*.  The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals.  Andrews v. Neer, 253 F.3d 1052, 1060-61 & 1061 n.7 (8th Cir. 2001).  The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *Id.*

As mentioned above, four short video clips of the incident exist.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court held that when "opposing parties tell two different stories,

-16-

one of which is blatantly contradicted" by video evidence contained in the record, "so that no reasonable jury could believe it, a court should not adopt that version of the facts." <u>Id.</u> at 380. In those circumstances, the court should "view[] the facts in the light depicted by the videotape." <u>Id.</u> at 381.

In applying the principles of <u>Scott</u> to this case, the Court can only conclude that no reasonable juror could find that Defendant used excessive force inside the pod. However, viewing the evidence in the light most favorable to Plaintiff, there is a question of fact as to whether the Defendant used excessive force when he took Plaintiff to the floor, cuffed, and uncuffed him, and kneeled on the Plaintiff's back. Much of this use of force occurs outside the view of the cameras. Thus, the video footage does not blatantly contradict either version of the events. It is clear that there was some type of struggle.

Plaintiff testified he was handcuffed when he was taken out of the pod. Once in pod control, Plaintiff maintains that Defendant slammed him into the wall and flipped him onto the floor. Plaintiff testified that the Defendant kneed him four or five times and then uncuffed him in the middle of the altercation. Plaintiff stood up but then was slammed to the floor, kicked, and punched in the head.

Moreover, Deputy Coggin testified that Plaintiff and Defendant were arguing and Defendant was upset. Deputy Coggin also testified that Defendant said he would uncuff Plaintiff and then they could fight like men. These facts call into question Defendant's actions in removing the handcuffs from Plaintiff.

-17-

Additionally, the color photographs depict some injury to various areas of the Plaintiff's body. Under the circumstances, there is a genuine issue of material fact as to whether Defendant responded reasonably.

## B.  Qualified Immunity

Alternatively, Defendant maintains he is entitled to qualified immunity.  "Qualified immunity is a defense available to government officials who can prove that their conduct did 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Carroll v. Pfeiffer, 262 F.3d 847, 849 (8th Cir. 2001)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Hunter v. Bryant, 502 U.S. 224, 229 (1991)(quoting, Malley v. Briggs, 475 U.S. 335, 343, 341 (1986)). The inquiry is normally one of pure law. J.H.H. v. O'Hara, 878 F.2d 240, 243 (8th Cir. 1989).

The issue of whether a state actor is entitled to the protection of qualified immunity involves a two-step process. See Washington v. Normandy Fire Protection Dist., 272 F.3d 522, 526 (8th Cir. 2001) . "[T]o overcome qualified immunity, [Plaintiff] must present sufficient facts to show not only (1) that the officer's conduct violated a constitutional right, but also (2) that the right was clearly established at the time of the alleged violation." Peterson v. Kopp, 754 F.3d 594, 600 (8th Cir. 2014).

"Although the defendant bears the burden of proof for this affirmative defense [of qualified immunity], the plaintiff must demonstrate that the law was clearly established." Monroe v. Ark. State Univ., 495 F.3d 591, 594 (8th Cir. 2007).  A right is clearly established if

-18-

the contours of the right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).

The cases discussed above clearly establish that a pretrial detainee may not be punished. Here, as detailed above, viewed in the light most favorable to the Plaintiff, there is a genuine issue of material fact as to whether the evidence shows an objective need for the force used. Plaintiff maintains he was slammed into the wall, taken to the floor, kneed four or five times while cuffed, then uncuffed and when he stood up was again slammed to the floor, kicked, and punched in the head.  Defendant is not entitled to qualified immunity.

**4.  Conclusion**

For the reasons stated, I recommend that Defendant's motion for summary judgment (Doc. 42) be denied in part and granted in part.  Specifically, the motion should be granted with respect to the use of physical force inside the pod.  The motion should be denied with respect to the use of physical force in the pod control area.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 2nd day of September 2014.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-19-